**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

KEITH VOGT and LISA JACKSON,

     Plaintiffs,

v.

KEVIN VOGT,

     Defendant.

Case No.: 1:23-cv-14150

## COMPLAINT AT LAW

Plaintiffs, KEITH VOGT, and LISA JACKSON, by and through their attorneys, hereby file this Complaint against KEVIN VOGT, and for their Complaint hereby allege as follows:

## NATURE OF THE CASE

This is an action for tortious interference with Plaintiffs' expectancy of inheritance on the part of Defendant. Plaintiffs assert that Defendant exerted undue influence and fraudulently induced the decedent into executing her last will and testament which named Defendant as the sole beneficiary and executor of decedent's estate. Further, if Plaintiffs are unable to substantiate their claims due to the Defendant's careless mishandling of crucial evidence, Plaintiffs assert a claim for negligent spoliation of evidence. Consequently, the Plaintiffs seek both actual and punitive damages from the Defendant for these transgressions.

## JURISDICTION AND VENUE

This Court has jurisdiction over Defendant pursuant to 28 U.S.C. § 1332 as there is complete diversity between Plaintiffs and Defendants, and the amount in controversy exceeds $75,000. This Court

is the proper venue pursuant to 28 U.S.C. § 1391(c)(1) because Defendant resides in Cook County, Illinois, and the relevant occurrences transpired within the State of Illinois.

## OVERVIEW OF OCCURENCES

1.      On April 23, 2023, the decedent, Aurora Joyce Vogt (hereinafter "Decedent") died testate in Glenview, Illinois, at the age of 83.

2.      Plaintiff KEITH VOGT is the surviving son of Decedent who resides at 6267 Adkins Avenue, Naples, Florida, 34112.

3.      Plaintiff LISA JACKSON is the surviving daughter of Decedent who resides at 17830 Mission Oak Drive, Lithia, Florida, 33547.

4.      Defendant KEVIN VOGT is the surviving son of Decedent who resides at 7003 West Seward Street, Niles, Illinois, 60714.

5.      Defendant was the primary caretaker of Decedent for the last several years up until Decedent's passing. As the primary caretaker of the Decedent, the Defendant held a position of trust and confidence. The Decedent heavily relied upon and placed significant trust in the Defendant. This position allowed the Defendant to seize on the opportunity to exert and wield a substantial amount of influence over the Decedent.

6.      Exploiting the trust and influence he had over the Decedent, the Defendant deceitfully took control of various aspects of the Decedent's daily life and finances.

7.      Defendant also actively sought to influence Decedent's feelings and perceptions towards Plaintiffs and her other son, Kurt Vogt[1] (collectively the "Vogt Siblings").

---

[1] Kurt Vogt predeceased Decedent.

8.      On numerous occasions, the Defendant misled the Decedent with false statements regarding his siblings' intentions and sentiments toward Decedent. This strategy was employed to portray himself as the only well-intentioned family member, facilitating his exploitation of the Decedent's financial resources.

9.      One of the more significant occurrences concerned Decedent's search for a new home in 2016.

10.      Prior to and during the search, the Vogt Siblings maintained a group text message chat amongst themselves (hereinafter, the "Sibling Group Chat"), in which the Vogt Siblings discussed Decedent's home search. Decedent was neither a member of the Sibling Group Chat nor aware of any messages shared within it.

11.      Plaintiffs later discovered that Defendant had carefully selected and presented specific text messages from the Siblings Group Chat to the Decedent after Kurt Vogt confronted Defendant about money he owed to Decedent. Defendant resorted to these acts of distortion in order to influence Decedent's home-buying decision and to create discord between Decedent and Plaintiffs. A true and accurate copy of these text messages is attached hereto as **Exhibit A** (hereinafter, the "Sibling Text Messages").

12.      Defendant intentionally influenced the Decedent to harbor negative sentiments towards Plaintiffs, her other children, and her friends. This strategy was employed to maintain control of and to exploit the Decedent's financial resources.

13.      As a result of the Defendant's actions, the Decedent penned a series of writings. These writings suggest that the Defendant swayed the Decedent into doubting the Plaintiffs' trustworthiness and into believing that they held negative views of her. A true and accurate copy of these writings is attached hereto as **Exhibit B**.

14.      The Defendant then took advantage of the discord he instigated between Decedent and Plaintiffs by taking Decedent to an estate attorney with whom he had both personal and professional ties.

3

Under Defendant's influence, Decedent executed the Last Will and Testament of Aurora Vogt (hereinafter "Decedent's Will" or the "Will"), naming Defendant as the sole beneficiary and executor of her estate. Decedent's Will contained several inconsistencies compared to what the Plaintiffs understood to be the Decedent's previous testamentary intentions. A true and accurate copy of the Will is attached hereto as **Exhibit C**.

15.    Plaintiffs now seek both actual and punitive damages from the Defendant because, absent Defendant's undue influence, Plaintiffs would have inherited equal portions of Decedent's estate.

## GENERAL ALLEGATIONS

16.    In 2006, Michael Vogt, Decedent's husband and father of the parties in this case, died intestate in Illinois. Michael Vogt's estate passed to Decedent.

17.    Prior to Michael's passing, Defendant obtained a significant sum of money, approximately $60,000 dollars, as a loan from Decedent in order to purchase a three flat residence at 1237 Wisconsin Avenue, Berwyn, Illinois, 60402 (hereinafter, "Defendant's First Home").

18.    Thereafter, in or around 2008, Plaintiff LISA JACKSON, having had access to Decedent's JP Morgan Chase bank savings accounts (ending in 6192 and 1886), noticed that an additional large sum of money, approximately $30-40,000 dollars, had been withdrawn. Plaintiff LISA JACKSON has reason to believe that the withdrawn funds were given to Defendant to refinance Defendant's First Home. Following the withdrawal, Defendant built a large second home at 1239 Wisconsin Avenue, Berwyn, Illinois, 60402.

19.    Around the same time, Plaintiff LISA JACKSON noticed recurring monthly charges for several hundreds of dollars towards a student loan servicing company. When questioned about the charges,

Defendant claimed that the charges must have been a mistake and that the charges were repayments for another individual:

<u>Text Message from Plaintiff LISA JACKSON</u>

(Lisa)

I also want to ask you about the latest "story" mom told about your students loans that were continually being deducted from her account. Is it true that there was a mistake in the ss number and those loans were for a girl not you? If so, that was an awesome catch but I see no credits to the account. I want to get this story straight

*See* Exhibit A, Page 1.

20.     Plaintiff LISA JACKSON called the student loan servicing company and confirmed that the charges were to pay student loans designated under the Defendant's name.

21.     Decedent had no prior knowledge of the recurring student loan charges made to the student loan servicing company.

22.     The recurring student loan charges continued even after Plaintiff LISA JACKSON confronted Defendant. Upon information and belief, Defendant continued to siphon off funds from Decedent's Chase savings accounts to pay for the recurring student loan charges up until the loan was repaid.

23.     Then, in 2016, Kurt Vogt, Decedent's predeceased son, assisted Decedent in finding a new home because Decedent's worsening mobility issues made living at her current residence difficult. The parties and their other siblings communicated with each other about Decedent's ongoing home search in the Sibling Group Chat of which Decedent was not a member nor privy to.

24.     Shortly thereafter, Decedent decided on the Brookdale Senior Living facility in Des Plaines, Illinois (hereinafter, the "Brookdale Residence"), and planned to go with Kurt Vogt to the Brookdale Residence to sign a lease. The Brookdale Residence[2]:



[2] Screenshots obtained from Brookdale.com; https://www.brookdale.com/en/communities/brookdale-des-plaines.html?&utm_medium=cpc&utm_source=google&utm_campaign=east-chi-brand-communities&regid=b-00803&utm_term=brookdale%20des%20plaines&los=all&utm_content=516778665819&_vsrefdom=fm20151030&g_acctid=700000001263788&g_campaign=t1l-east-chi-brand-communities&g_campaignid=358690473&g_adgroupid=27881898033&g_adid=516778665819&g_keyword=brookdale%20des%20plaines&g_keywordid=kwd-145488188193&g_network=g&gclid=CjwKCAjwu4WoBhBkEiwAojNdXuZTJcPBq6ZwS3BElcybeeJslmZmOAsH__bW58ByFfOxpaxOUiEZTBoCo4QQAvD_BwE&gclsrc=aw.ds. Last Date Accessed: September 13, 2023.

## Exceptional Senior Living

Trade your to-do list for a bucket list. At Brookdale Des Plaines, just outside of Chicago, you'll have independent living and assisted living on the same campus, allowing the lifestyle you want plus care in our assisted living if you need it. Trade home maintenance for more time to do what you want to do. Maybe you've always wanted to try tai chi. We have a class for that. Or maybe you want to explore an old passion for painting and art. Now you can.

You'll have several floor plans to choose from, and our luxury apartments have plenty of natural light and storage. Plus, you'll have your own indoor pool just down the hall. Maybe you've always wanted to learn to play Rummikub or try yoga. Now you can. And we know that peace of mind matters to you and your family. That's why our staff is available 24 hours a day, seven days a week, to be alerted to an emergency.

### Featured Amenities

- Emergency Alert System
- Indoor Pool
- Fitness Center
- Transportation
- Library
- Concierge Service
- Personal Solutions

View all amenities (33) ›

### Floor Plans

View our floor plan options to find the right fit for you.

Download floor plans ›

---

### Care Offered at Brookdale Des Plaines



**Independent Living**

Independent living is ideal for seniors who want to trade in the extra work home upkeep for a vacation lifestyle plus the true comforts of home. You'll have a stylish apartment, restaurant-style dining and plenty of opportunities to socialize and connect with friends.

**Explore Independent Living**



**Assisted Living**

Our assisted living lifestyle provides the independence you deserve with a helping hand to meet your needs. Our care team partners with you and your family to customize your care for your specific needs like dressing and managing medications.

**Explore Assisted Living**

---

## Brookdale Continues to Lead the Way with 265 Recognized Communities in the U.S. News & World Report "Best Senior Living" Rankings

In the U.S. News & World Report Best Senior Living' ratings for 2023, Brookdale has more senior living communities recognized than any other provider for the second year in a row. The designation is awarded based on consumer satisfaction surveys administered between October 10, 2022 and October 24, 2022 that reflect the viewpoints of more than 200,000 current residents and family members of residents living in senior living communities nationwide. See The List.

\* Tied in 2022. For J.D. Power 2022 award information, visit jdpower.com/awards



**#1 in Customer Satisfaction with Assisted Living/Memory Care Communities**

Tied in 2022. For J.D. Power 2022 award information, visit jdpower.com/awards



**The Most Communities Recognized by US News & World Report.**

25.     Around the same time, Kurt Vogt disclosed to the Plaintiffs the monetary debts Defendant owed to the Decedent in the Sibling Group Chat, stating that Defendant should repay Decedent so that Decedent could afford to live at the Brookdale Residence. Unexpectedly, however, Decedent changed her mind about signing a lease to live at the Brookdale Residence:

| Text Message from Plaintiff KEITH VOGT[3] | Text Message from Kurt Vogt[4] |
| --- | --- |



See Exhibit A, Pages 2-3.

26.     One year later, in early 2017, Defendant rushed to move Decedent into a new residence of his own choosing. Specifically, Defendant moved Decedent into a rental property at 1772 Rogers Ave, Unit

---

[3] The "place in Niles" refers to the Brookdale Residence.
[4] This text message from Kurt Vogt to Plaintiff LISA JACKSON was sent separate and outside of the Vogt Sibling Group Chat.

R, Glenview, IL (the "Glenview Residence"). Unit R referred to a garage located behind the home located at that address. Defendant found and selected this location for Decedent on Craigslist.com, despite the Vogt Siblings' concerns over Decedent's mobility issues. The Vogt Siblings, with the exception of Defendant, believed the Brookdale Residence offered the amenities necessary to assist Decedent with her mobility issues. A comparison of the two properties is provided here (a true and accurate copy of the Glenview Residence photographs is attached hereto as **Exhibit D**):

| Brookdale Residence[5] | Glenview Residence |
|---|---|
|  | |

---

[5] Brookdale Residence screenshots were captured from Brookdale.com; https://www.brookdale.com/en/communities/brookdale-des-plaines.html. Last Accessed: September 8, 2023.



Brookdale Des Plaines - Apartment Kitchen



Brookdale Des Plaines - Apartment Living Room



Brookdale Des Plaines - Apartment Bedroom















*See* Exhibit D.

27.    Decedent signed the lease and submitted a deposit on the Glenview Residence before Plaintiffs, or any other sibling, were made aware of the new location:

<u>Text message from Kurt Vogt</u>

( Kurt )

Thanks Kevin & Justin for getting all the other items cleaned out

*Thank you! Kevin for the help you have given me and paying for the rental truck to help me move. Sorry for the items at the storage place... [illegible handwritten note]*

♡ mom

Unfortunately I do not have the address because the Craigslist posting expired and mom did not have it

Kevin can you get me the address so I can help get the remaining items to her new place

<u>Text Message from Defendant</u>

( Kevin )

Ok...can you just be happy for her. She looked at 8 places with me and this is the place...she liked. She has a 12 month lease....so if she does not want to stay there she can move......now that she has downsized her stuff to the size of an 800 sq ft apartment....her furniture and belongings could be moved in a half day.

*See* Exhibit A, Pages 4-5.

14

28.     Then, on or about August 7, 2017, Decedent sold her completely paid off home at 2362 Carillon Drive, Grayslake, Illinois (hereinafter the "Carillon Residence")[6] for $205,000, an amount significantly less than the original purchase amount of $247,000 in 2004. Prior to the sale, Kurt Vogt intended to help the Decedent sell the Carillon Residence and minimize her expenses. However, based on information and belief, Defendant persuaded Decedent to expedite the sale of the Carillon Residence, resulting in a financial loss:

| Text from Kurt Vogt | The Carillon Residence[7] |
|---|---|
|  | |

*See* Exhibit A, Page 6.

---

[6] The Carillon Residence was located in the Carillon North Private Active Adult Living Community, a gated community designated for seniors and retirees.
[7] Photographs obtained on Zillow.com; https://www.zillow.com/homes/2362-Carillon-Drive,-Grayslake,-Illinois-_rb/54866653_zpid/ Last Date Accessed: September 8, 2023.

29.     Around the same time, Decedent's JP Morgan Chase savings accounts (ending in 6192 and 1886) were closed.

30.     Decedent's closest friends, Helen Knox and Ida Melchoire, were also unaware that Decedent was moving until they were informed by Plaintiff LISA JACKSON.

31.     At some point in 2017, Helen Knox and Ida Melchoire visited Decedent at the Glenview Residence and subsequently informed Plaintiff LISA JACKSON about the rental property's poor condition and shared their repugnance that Decedent was living in such a dilapidated place:

<u>Text Message from Helen Knox</u>



*See* **<u>Exhibit E</u>**, Page 1.

16

Letter to Plaintiff LISA JACKSON from Helen Knox

| Helen Knox's Letter | Translation |
|---|---|
|  | "& hope to talk to you soon. Ida and I went to your mom's home & took her out to lunch before Ida & Lou left for FL. **We were both sad to see where & how she is living**. She came to Jim's service. I was very pleased. All of you please take care of each other. Best wishes, Helen" |

*See* Exhibit E, Page 2. (emphasis added).

32.     Decedent's family would often characterize the Glenview Residence as a "renovated garage."

33.     Helen Knox and Ida Melchoire also provided that Decedent would decline social invitations because Defendant did not want to drive her. Upon information and belief, Decedent would only frequent places that Defendant would select for her. Decedent would often have to resort to using Uber or a different ride-share service to meet with friends or to travel to appointments because Defendant did not want to take her places.

17

34.     Plaintiffs later discovered that Defendant selectively printed out self-serving text messages from the Sibling Group Chat to show to Decedent. Defendant printed out the text messages from the Sibling Group Chat to gain favor with Decedent while portraying his siblings, including the Plaintiffs, in a negative light.

35.     Upon information and belief, Defendant influenced Decedent into annotating the Sibling Text Messages. Defendant further manipulated Decedent's responses to each Sibling Text Message by presenting her with deceptive and misrepresented information about the Plaintiffs' intentions concerning her potential new living arrangement.

36.     For example, Plaintiffs' and Kurt's true intentions behind finding a new home for Decedent was to find her a place where she could receive help for her "diminishing capacity," as well as for her "problem with walking/balancing":

<u>Text Messages from Plaintiff KEITH VOGT</u>[8]



---

[8] The Carillon Residence and the Glenview Residence are the two pieces of property that this text message refers to. As explained above, Defendant rushed to move Decedent into the Glenview Residence before selling the Carillon Residence, resulting in a financial loss to Decedent.

Keith

Kevin. I called mom. Apparently the "friend" is a perfect stranger that is the son of a painter mom hired. This is further evidence of the urgency to have mom evaluated since it shows mom is giving things away to strangers and needs to have her assets protected from frivolous depletion.

Mar 30, 2017, 5:35 PM

I have a couple things to say...
The one piece of furniture she gave to a

  Text Message 

Keith

The object here is to coordinate together a plan going forward to ensure mom's physical and financial well being. If we cannot do that I will seek the assistance of the court to have a guardian appointed to do the same. She is almost out of funds and we cannot leave this unaddressed.



*See* Exhibit A, Pages 7-9.

Text Messages from Plaintiff LISA JACKSON



*See* Exhibit A, Pages 10-11.

37.    Defendant, however, deceitfully influenced Decedent into believing that Kurt Vogt and Plaintiffs were forcing her into moving into the Brookdale Residence. Consequently, Decedent began to accuse the Vogt Siblings of bullying her.

38.    Defendant also deceitfully led the Decedent to believe that the Vogt Siblings perceived her as a hateful individual:

Text Message from Defendant

( Kevin )

I dont think its hateful
when Kurt wanted
a business and she
helped. Lisa moved to
Florida and she helped.
Paula was in a bind
and she helped. Uncle
Sal moved to Mount
Prospect and she
helped.  I would call that
loving your family. Say-
ing that she is a hateful
is a curse on mom and
should never be said...it

*See* Exhibit A, Page 12.

39.        Plaintiffs, nor their other siblings, had ever made such comments about Decedent being a hateful person, nor did they ever attempt to put a "curse" on Decedent.

40.        Ultimately, Defendant's misrepresentations about Plaintiffs' intentions lead Decedent to produce the following writings:

| Decedent's Writings | Transcription of Decedent's Writings |
|---|---|
| | "(hope they can remember this) I also helped Keith & Pam by babysitting Ryan & Catherine, so Pam had to be at bed rest in ar [sic] to have Delaney." <br><br> "When I lived at Carillon, I helped them store their car in my garage for them to save their money" |



"Distance yourself from people who:

(1) Disrespect you;

(2) Use you;

(3) Put you down;

(4) Drag you down;

(5) Do not have your back at all times.

Stay close to people who!

(1) Respect you;

(2) Help you;

(3) Love you;

(4) Encourage you;

(5) Have your back at all times;

(6) Stick up for you;

(7) Do not gossip about you."

"(1) I stay my distance from them, because I do not trust them (I forgive them)

(2) I am hurt by these people

(3) Some people cannot trust, are family members and a friend. Because Lisa sent me nasty text about (called me a liar) and turned by sons, Kurt & Keith against me and to spy on me. Kurt went into my home in Carillion against my wishes when I was at Carillion & took my [illegible writings]. He was told by me not to enter my home! Lisa told Keith I was senile and wanted to get a judge also involved was Uncle Sal, Rosemary Carlson, my sister, Helen Knox, who was supposed to be my Friend."



"Thank you God for protecting me from this evil act!

(4) I was called a liar by Lisa. They were not…

(5) Nice to my son Kevin & blamed him for everything"

*See* Exhibit B.

41.     These writings indicate that Defendant had influenced Decedent into wrongfully believing that:

a.   Plaintiffs could not be trusted;

b.   Plaintiffs were disrespecting her;

c.   Plaintiffs were ungrateful for the help that Decedent had previously provided to them;

d.   Plaintiffs were attempting to put or drag her down;

e.   Plaintiffs nor her other children or friends "had her back";

f.   Plaintiffs gossiped about her;

g.   Plaintiff LISA JACKSON was actively attempting to turn her sons, Plaintiff KEITH VOGT and Kurt, against her;

h.   Plaintiff LISA JACKSON told Plaintiff KEITH VOGT that she was senile;

    i.    Plaintiff KEITH VOGT and Kurt Vogt were spying on her when she lived at the Carillon Residence;

    j.    Plaintiffs and their other siblings were trying to commit an evil act against her; and

    k.    Defendant had never done anything wrong.

42.       Decedent's relationships with Plaintiffs and the Vogt Siblings suffered because of Defendant's misrepresentations. Communications between Plaintiffs and Decedent became less frequent over the year(s).

43.       Then, on February 8, 2021, Decedent executed the "Last Will and Testament of Aurora Vogt" (hereinafter, "Decedent's Will" or the "Will"), which was drafted by Laura E. Cohen, an attorney at the law firm of Pinzur, Cohen & Kerr, Ltd. in Long Grove, Illinois. *See* Exhibit C, Page 4.

44.       Upon information and belief, Defendant chose and took Decedent to the law firm of Pinzur, Cohen & Kerr, Ltd. because Defendant had a professional and personal relationship with Laura E. Cohen, an estate attorney at the firm:



*See* **Exhibit F** ("Defendant's Facebook Friendship Status with Decedent's Estate Attorney").

45.     Consequently, Defendant was named as the sole beneficiary and executor of all of Decedent's estate and its assets under the Will. *See* Exhibit C, Pages 1-3.

46.     Plaintiffs were not made aware of the Will's existence nor of its contents until after Decedent's passing in 2023.

47.     The Will also contained the following inconsistencies:

   a.  Decedent "specifically [left] nothing to [her] other children as they have received gifts during [her] lifetime." *See* Exhibit C, Page 1. Plaintiffs, however, had never received any gifts from Decedent during her lifetime. Strangely, the Will also made no mention of the significant sums of money Defendant had received from Decedent during her lifetime.

   b.  Decedent "desire[d] to be cremated." *See* Exhibit C, Page 3. Plaintiffs and their siblings knew that Decedent desired a traditional in-ground burial.

   c.  Further, and prior to the execution of the Will, Decedent had expressed on numerous occasions her intent to provide an inheritance for her surviving children, including Plaintiffs, as well as for her grandchildren.

48.     Later that year, on September 29, 2021, Decedent closed her checking account with JP Morgan Chase (account number ending in 9714). Sometime after, Decedent opened a new checking account with the Defendant listed as a joint owner of the account. *See* **Exhibit G**, Page 4 ("Aurora Vogt Bill Payments").

49.     Decedent also maintained a Facebook account which she used frequently to communicate with her children and many grandchildren. After Decedent's death, her children and grandchildren discovered that Decedent's Facebook account would show as active. Decedent's children and grandchildren then discovered that messages sent by Decedent to her grandchildren via Facebook

Messenger were being deleted (a true and accurate copy of the suspicious Facebook activity is attached hereto as **Exhibit H**):

<u>Decedent's Status on Facebook Showing as "Active" Post Death</u>



<u>Decedent's Grandchildren Sent Plaintiffs a Message Reporting the Suspicious Activity</u>



<u>Previously Sent Messages from Decedent Which Were Found Deleted</u>



*See* Exhibit H.

50.     Upon information and belief, at each and every occurrence, Defendant exerted direct control and influence over Decedent's decisions. Defendant also consistently resorted to misrepresentations and falsehoods to cast his siblings, including Plaintiffs, in an unfavorable light, aiming to discourage Decedent from maintaining regular communication or interaction with them. Consequently, Defendant's actions eroded Decedent's trust in her other children, including Plaintiffs, leading to the deterioration of those relationships.

51.     But for Defendant's conduct, Plaintiffs would have maintained their healthy relationships with Decedent and would have realized their inheritance expectancy.

52.     As a result of these occurrences, Plaintiffs now seek compensatory and punitive damages for Defendant's tortious interference with their inheritance expectancy and for fraudulently inducing Decedent into executing the Will which left Defendant as the sole beneficiary of Decedent's entire estate.

<u>**COUNT I**</u>
<u>**TORTIOUS INTERFERENCE WITH AN EXPECTANCY OF INHERITANCE**</u>

53.     Plaintiff realleges and incorporates herein by reference paragraphs 1-52 as if said paragraphs were fully set forth herein.

54.     Upon information and belief, Defendant harbored resentment towards his older siblings, including Plaintiffs for not having significant student loans like him.[9]

55.     Defendant also often alluded to a "life lesson" he believed his siblings needed to learn:

---

[9] Plaintiff LISA JACKSON provides that the older siblings received Pell grants and other financial aid, and that their lack of significant student loans was not the result of their parents paying for it. Plaintiff KEITH VOGT enlisted in the United States Marine Corps to pay for college.



*See* **Exhibit I**.[10]

56.　　Given Defendant's role as Decedent's primary caretaker, the Decedent placed immense trust in and reliance on the Defendant.

57.　　Defendant, on numerous occasions, took advantage of his position as primary caretaker by intentionally misleading and deceiving the Decedent, notably through fraudulent misrepresentations of fact surrounding matters such the recurring student loan charges to Decedent's bank accounts, Plaintiffs' true intentions regarding the Brookdale Residence, Decedent's eventual reconsideration and selection of the Glenview Residence, and the circumstances surrounding the execution of the Will.

---

[10] This is one example of a time where Defendant would say that his siblings needed to learn a "life lesson." This comment came after Defendant had his personal email hacked. Defendant here turned to Facebook to publicly accuse Plaintiff KEITH VOGT of being the hacker responsible for his compromised email account, stating that he was a "rogue attorney." Plaintiffs, however, were in no way responsible for Defendant's breached email account because they played no part whatsoever in its exposure. This was nothing but another attempt made by the Defendant to demonize and portray Plaintiffs in a negative light.

58. Defendant also controlled the Decedent's financial transactions during the last years of her life. In that time, Defendant exerted undue influence over the Decedent and coerced her into transferring to him large sums of money on multiple occasions.

59. Such deceptive actions by the Defendant interfered with and tainted the Decedent's attitude and perceptions towards the Plaintiffs, her other children, and closest friends. Upon information and belief, at each instance where Plaintiffs and Decedent's other family had attempted to help Decedent in making prudent lifestyle choices for herself (such as the selection of the Brookdale Residence which had the amenities to assist Decedent with her mobility issues), Defendant would step in and cast his siblings, including Plaintiffs, in an unfavorable light in order to convince Decedent into performing an action that was for his own personal self-interest and benefit.

60. Defendant further maintained control and exerted dominance over Decedent's whereabouts and communications. Decedent only frequented places where Defendant was willing to take her. Defendant also directly influenced and impeded communications between Decedent and her children, including Plaintiffs, by misrepresenting the siblings' intentions to Decedent.

61. Defendant's continuous, deceitful actions deliberately isolated Decedent and kept Decedent distant from her other children, including Plaintiffs, and the remainder of her family, including grandchildren.

62. Prior to the execution of the Will, Decedent had expressed her intention of leaving equal portions of her estate to her surviving children, including Plaintiffs, and to her grandchildren. Therefore, Plaintiffs had a clear inheritance expectancy.

63. Plaintiffs did fully and reasonably expect to inherit equal portions of Decedent's estate upon the death of Decedent.

64.     Defendant purposefully thwarted Plaintiffs' expectation of inheritance by exerting undue influence, control, duress, fraud, and/or coercion over Decedent, and by consistently providing Decedent with lies and misrepresentations about the intentions of his siblings. Defendant intentionally exerted control over the process of disinheriting Plaintiffs.

65.     Plaintiffs stood to inherit from Decedent's estate if it had not been for Defendant's interference.

66.     Absent Defendant's undue influence, the Decedent would not have executed the Will bequeathing all of Decedent's estate exclusively to Defendant and excluding the Plaintiffs.

67.     As a direct and proximate result of Defendant's manipulations and false portrayals of his siblings, Plaintiffs suffered financial losses from the Decedent's estate.

68.     Defendant's tactics effectively stripped the Decedent of her free will, supplanting it with his own objectives and desires.

69.     But for Defendant's tortious conduct, Plaintiffs would have realized their inheritance expectancy.

## COUNT II
## FRAUDULENT INDUCEMENT

70.     Plaintiff realleges and incorporates herein by reference paragraphs 1-69 as if said paragraphs were fully set forth herein.

71.     Upon information and belief, Defendant knowingly made to Decedent the following fraudulent and willfully false statements of fact, with the intent to deceive Decedent and cause her to execute her Will in reliance of these false statements of fact:

        a.      In 2016, after Kurt Vogt disclosed to Plaintiffs the monetary debts Defendant owed to Decedent in the Sibling Group Chat, Defendant lied and misrepresented Plaintiffs' and Kurt's intentions to Decedent about moving her into the Brookdale Residence. Specifically, Defendant

31

misrepresented to Decedent that Kurt and Plaintiffs were forcing her to move into the Brookdale Residence and that they were attempting to bully her.

    b.    In 2020, Defendant misrepresented to Decedent that:

        i.    Plaintiffs could not be trusted;

        ii.    Plaintiffs were disrespecting her;

        iii.    Plaintiffs were ungrateful for the help that Decedent had previously provided to them;

        iv.    Plaintiffs were attempting to put or drag her down;

        v.    Plaintiffs nor her other children or friends "had her back";

        vi.    Plaintiffs gossiped about her;

        vii.    Plaintiff LISA JACKSON was actively attempting to turn her sons, Plaintiff KEITH VOGT and Kurt Vogt, against her;

        viii.    Plaintiff LISA JACKSON told Plaintiff KEITH VOGT that she was senile;

        ix.    Plaintiff KEITH VOGT and Kurt Vogt were spying on her when she lived at the Carillon Residence;

        x.    Plaintiffs and their other siblings were trying to commit an evil act against her; and

        xi.    Defendant had never done anything wrong.

    c.    In 2021, Defendant misrepresented his intentions to Decedent about executing her Will. Upon information and belief, Decedent was unaware that Defendant had a professional and personal relationship with Laura E. Cohen, the estate attorney who drafted her Will, prior to and at the time she executed the Will.

    d.    Around the same time, Defendant misrepresented to Decedent that Plaintiffs had already received testamentary gifts from her during her lifetime.

72.     The Decedent was deceived by the above fraudulent statements and, in reliance on those fraudulent statements, she disinherited Plaintiffs from the Will executed on February 8, 2021. Further, Decedent was induced to rely upon these statements to provide solely for Defendant in the Will.

73.     The above misrepresentations and fraudulent statements began as early as 2007 and continued until the time of Decedent's death in 2023, and the Decedent had relied upon the veracity of these statements at the time she executed the Will in 2021.

74.     Decedent would not have disinherited Plaintiffs but for the false and fraudulent statements of Defendant; further, she would not have executed the Will bequeathing her entire estate exclusively to Defendant. As a result of these frauds committed upon Decedent, she disinherited Plaintiffs and made Defendant the sole beneficiary under the Will.

75.     That the Supreme Court of Illinois in *In re Estate of Hoover*, 155 Ill. 2d 402, 185 Ill. Dec. 866, 615 N.E.2d 736 (1933) has specifically authorized this claim as a separate cause of action; therefore, Plaintiffs are seeking all common-law remedies incident to a claim for fraud, including an award of punitive damages against Defendant who committed the fraud on Decedent.

**COUNT III**
**NEGLIGENT SPOLIATION OF EVIDENCE**

76.     Plaintiff realleges and incorporates herein by reference paragraphs 1-75 as if said paragraphs were fully set forth herein.

77.     On May 9, 2023, Plaintiff KEITH VOGT delivered a letter to Defendant notifying Defendant of Plaintiffs' intention to contest the validity of the Will and file a lawsuit against Defendant for tortious interference. A true and accurate copy of the letter to Defendant is attached hereto as **Exhibit J**. The letter further notified Defendant to:

    a.      Preserve all written and telephonic communications, and electronically stored information, copies, and backup, along with any paper files Defendant maintained, relevant to the

33

potential lawsuits including all documents relating to and all communications with Decedent and any attorneys, law firms, accountants, financial planners, and financial institutions concerning Decedent;

      b.      Preserve all financial documents, contracts, text messages, and emails Defendant had relating to Decedent as well as any member of their family;

      c.      Preserve all financial documents, contracts, text messages, and emails Defendant has relating to any funds received from Decedent; and

      d.      Preserve all communications with Laura J. Cohen and her law firm, Pinzur, Cohen & Kerr, Ltd., including all emails and text messages.

*See* Exhibit J.

78.      Given his awareness that the Plaintiffs would be excluded from the Decedent's Will, the Defendant either knew, or reasonably should have known that all written and electronic communications, along with any financial documentation, related to the Will's execution, including but not limited to the evidence described in ¶ 77, would constitute material evidence in a potential civil action. In any event, any reasonable person in the Defendant's situation would have anticipated the significance of such communications and documentation in a forthcoming legal dispute.

79.      Especially here where these special circumstances gave rise to a duty on the part of the Defendant to preserve the evidence related to the execution of Decedent's Will, including all written and electronic communications, along with any financial documentation, related to the Will's execution, including but not limited to the evidence described in ¶ 77.

80.     On a later date, Defendant breached his duty by negligently destroying, discarding, or otherwise failing to preserve all written and electronic communications, along with any financial documentation, related to the Will's execution, including but not limited to the evidence described in ¶ 77.

81.     The loss or destruction of the evidence is the direct and proximate cause of the Plaintiffs' disinheritance and their inability to prove their otherwise valid fraudulent inducement and tortious interference with an inheritance expectancy causes of action.

82.     As a result of Defendant's conduct, Plaintiffs have suffered actual damages; namely, loss of inheritance and the inability to present the best evidence of Defendant's conduct at and leading up to the time Decedent executed the Will.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief against Defendant:

1)     Declare that Defendant tortiously interfered with the Plaintiffs' expected inheritance;

2)     Determine that, absent Defendant's wrongful actions, Plaintiffs would have been beneficiaries of a portion of Decedent's estate or its subsequent sales proceeds;

3)     Declare that Defendant fraudulently induced Decedent into executing the Will which named Defendant as the sole beneficiary;

4)     Determine that, but for Defendant's fraudulent inducement, Plaintiffs would have realized their inheritance expectations;

5)     Award compensatory damages to Plaintiffs, in an amount reflecting their lost expectancy from Decedent's assets, due to Defendant's actions;

6)     Award Plaintiffs reasonable attorneys' fees and related expenses as punitive damages, to be borne by Defendant;

7)      Impose additional punitive damages upon Defendant, in an amount no less than $100,000

dollars per Plaintiff, in recognition of his deliberate and egregious efforts to undermine Plaintiffs'

inheritance rights;

8)      Grant any other relief that this Court deems just and proper.


DATED:  September 26, 2023                      Respectfully submitted,


                                                _/s/ Monica Martin_

                                                Monica R. Martin (Bar No. 6342282)
                                                JiangIP, LLC
                                                33 West Jackson Boulevard, #2W
                                                Chicago, Illinois 60604
                                                Telephone: (312) 248-4210
                                                E-mail: mmartin@jiangip.com


                                                ***ATTORNEY FOR PLAINTIFFS***